**UNITED STATES of America**

v.

**Robert F. HINTON.**

**Cr. No. 951-57.**

United States District Court
District of Columbia,
Criminal Division.

March 25, 1958.

Frederick G. Smithson, Asst. U. S. Atty., for the United States.

J. Leon Williams, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

The defendant was arrested on the morning of August 8, 1957. He was driving his automobile and had stopped for a red light when the police officers motioned him over to the curb and told him to stop his car. He did so. He was placed under arrest. Pursuant to the arrest he was searched and three capsules of heroin were found on his person.

Defendant moved at the trial to suppress the evidence of heroin. He urged that there was no probable cause for this arrest and, therefore, the subsequent search and seizure was unreasonable. The Court denied the motion.

Counsel now has moved for a new trial or, in the alternative, for a judgment of acquittal. Counsel's motion is based upon the argument that the capsules found upon the defendant should not have been introduced into evidence since the arrest was illegal.

As the Court of Appeals for the District of Columbia has recently said in dealing with an arrest similar to this one: "The question is what constituted probable cause in the eyes of a reasonable, cautious and prudent peace officer under the circumstances of the moment." [1] The circumstances in this case are as follows:

1. Bell v. United States, D.C.Cir.1958, 254 F.2d 82.

The police had obtained the information that Joseph Davis, alias black Sammy, a rather large dealer in narcotics, was residing at 648 Lamont Street, N. W. A guard sat just inside the door of 648 Lamont Street twenty-four hours a day. After careful surveillance, the police learned that the method of gaining entrance to 648 Lamont Street was first to go into Bannisters, a delicatessen near the house, and place a phone call. Then the person would go into the house, complete his business in a short while, and leave.

The police had observed personally, and through an informer (Charles Harden) were notified of the activities of Davis and those associated with him. Their reports, as introduced into evidence, go back to the middle of December, 1956.

December 19, 1956: The informer, Charles Harden, through Forest McAbee, bought narcotics from Davis. The informer later gave one of those capsules to the defendant, Robert F. Hinton.

December 20, 1956: Bureau of Narcotics agents observed Davis and the defendant leave 2529 11th Street at 3:50 a. m. and get into Forest McAbee's Pontiac. At 4:20 a. m. the agents observed the car return to the area. Davis and Hinton went into 2529 11th Street. Informer later told the agents that when Davis re-entered the house, he had cocaine on his person. The informer bought narcotics from Davis at that time.

December 22, 1956: Harden, at the request of the police, telephoned Davis and asked to buy narcotics from him. During the conversation, Davis mentioned that he had spent the afternoon in the company of McAbee, "Ironjaws" and "Lips". The defendant's nickname was known to the police to be "Lips".

December 27, 1956: The informer asked where he could find Davis. Harden was told by the defendant to go to Odessa Madre's address. The police had information that Davis was supplying cocaine which was used and illegally sold at Odessa Madre's house. Odessa Madre had been previously convicted of nar-

cotics and was known to be involved with the narcotics traffic.

January 5, 1957: The informer bought narcotics from Jerry McCutcheon in the presence of the defendant.

Shortly after this, Harden, the informer, was mentioned in the trial of another case. He was thereby discovered and no longer able to provide information.

Commencing in February or March of 1957, the police obtained information that a group had formed which included Davis, the defendant, "Streamy" Washington—formerly convicted for narcotics violation—and others, which called itself "The Wasters". The police information, which was later corroborated in part by Cornelius Parker, one of the group who was arrested for violation of the narcotics laws, was that the group would meet at one another's homes for the purpose of using narcotics illicitly. The defendant admitted that he was a member of the group for three or four months but denied the above purpose of the organization. The group was known to exist until August 4, 1957.

The government also introduced Pearl Woodward, a former girl friend of the defendant, who admitted that she and the defendant had used narcotics together.

The defendant was convicted in 1951 in South Carolina for violation of the state narcotic laws.

On the evening of August 7th and the early morning hours of August 8th when the arrest of the defendant took place, the following sequence of events occurred:

The police noticed Forest McAbee's Pontiac about 10:30 p. m. the evening of the 7th and followed it. At about 11:00 p. m. the car was driven to 225 Morgan Street where the defendant entered the car. They drove together then to 7th and "T" Streets where the car was parked and both got out. About twenty minutes later the defendant returned alone. He entered the car and drove directly to the intersection of Georgia Avenue and Lamont Street, N. W. Upon leaving the car, he walked into Bannisters' Delicates-

sen and stayed for a very short time—not more than two minutes—before leaving. He then walked over to 648 Lamont Street. He stayed there approximately five minutes and then got into his car and drove away. The police followed and, at the first stop light, asked him to pull over. He did so. They placed him under arrest, searched him, and found the prohibited drugs.

Defendant testified at the trial that the reason why he entered Bannisters' Delicatessen was to purchase cigarettes. However, no cigarettes were found on him ten minutes later when he was arrested and searched. The possibility that it was sheer coincidence that defendant fell into the pattern known by the police to be necessary in order to enter Davis' house, in view of the other evidence in the case, is almost impossible.

Defendant's counsel has argued that he was not arrested because of the belief that he had committed any crime, but solely to search him. The testimony on which defendant's argument is based is as follow:

Cross-examination of Agent Thompson.

"Q. Now, Agent Thompson, I ask you was it your purpose at the time you seized the automobile to arrest the defendant or to seize the automobile? A. My purpose was both, to seize the automobile and to arrest the defendant.

"Q. Now, what were you going to arrest the defendant for? A. I was going to arrest the defendant to find what he had been doing at 648 Lamont Street. Talk to him.

"Q. In other words, you arrested the defendant in order to search him, did you not? A. I did.

"Q. Now, could you say, Agent Thompson, that you would have arrested anybody who was driving that car that night at that time? A. No, sir, not anybody.

"Q. Well, was there a certain class. of persons about whom you testified that you would have arrested if they had been operating that car that night? A. Only if they had done certain things which the defendant had done.

"Q. Anybody who had gone to Bannister's Delicatessen and who had gone in 648 Lamont Street and who was operating that car would have been arrested? A. Not anybody.

"Q. Well, if it had been McAbee, would you have arrested him? A. Yes, sir.

"Q. If it had been Streamy, would you have arrested him? A. Yes, sir.

"Q. If it had been Sammy, would you have arrested him? A. Sammy lives there. It would be a question.

"Q. Then, Agent Thompson, it is not the fact that the information you had previously with regards to this defendant which caused you to arrest him that night, is it?" [2]

An objection was raised to this question and after some discussion the question was permitted and restated to the witness by the Court.

"The Court: He wants to know whether it is a fact that you made the arrest of this defendant based upon the information you had previously received.

"The Witness: Yes, sir.

"The Court: Plus, I assume, what you saw take place that night?

"The Witness: Yes, sir." [3]

These last answers rather clearly show that the arrest was based upon the observations and information gained as a result of some eight months of investigation and the events of that evening. Agent Thompson's statement that defendant was arrested in order to search him must be taken in context. It was

2. Transcript, pp. 51–52.

3. Transcript, p. 53.

undoubtedly true that if the search had uncovered nothing then the defendant would have been released. In this sense the arrest was in order to search. But the Court feels that what the officer meant was that the arrest was for a narcotics violation and preliminary to a search to determine with certainty the truth or falsity of the violation.

Probable cause is not a matter of verbal legerdemain or the careful coaching of police officers beforehand. The facts of probable cause are either present or not and verbal response does not change this at all.

The Court of Appeals for the District of Columbia had a similar situation in Bell v. United States.[4] Again there was an automobile involved and again artless testimony by the arresting officer. The Court said:

"At the trial in the case at bar, in answer to the question, 'And for what offense were they being arrested at that time?', the officer testified, 'Investigation of housebreaking.' Of course there is no such crime as 'Investigation'. But this description given by the officer does not go to the question of probable cause. The question is not what name the officer attached to his action; it is whether, in the situation in which he found himself, he had reasonable ground to believe a felony had been committed and that the men in the car had committed it. The situation was a sudden unanticipated development. Suppose the officer had arrested these men upon belief that they had committed a housebreaking, but the legal lights in charge of preparing indictments had decided the offense was robbery; or suppose later information had disclosed a murder. Would the arrest have been invalid? Of course not. So to hold would make a mockery of the Supreme Court's admonition to us that probable cause is a matter

of practicalities, not of technicalities."

This language is particularly applicable here.

 After a careful review of the evidence and the testimony of the case, the Court is of the opinion that the arresting officers had reasonable grounds upon which to make an arrest. Therefore the search incident to that arrest was valid.

The motion is denied.